**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Artez Lamont ROGERS and Harrison R. King, Defendants–Appellants.**

**Nos. 94–2368, 94–3836.**

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1996.

Decided July 17, 1996.

1328

David E. Risley (argued), Office of U.S. Atty., Springfield, IL, for U.S.

Thomas E. Griffith, Jr. (argued), Erickson, Davis, Murphy, Johnson, Griffith & Walsh, Decatur, IL, for Artez Lamont Rogers.

Jon G. Noll, Jeffrey T. Page (argued), Springfield, IL, for Harrison R. King.

Before CUMMINGS, ESCHBACH and DIANE P. WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendants Harrison King and Artez Rogers raise several challenges to their respective convictions for various drug-related activities, including murder in furtherance of a continuing criminal enterprise and possession and distribution of cocaine. We affirm the district court on all counts. Most notably, we reject defendants' argument that their criminal enterprise must have had a purpose "separate and apart" from drug dealing in order to qualify as an "enterprise" under 18 U.S.C. § 1959.

## I.

The facts of this case are numerous and complicated. Given the nature of the defendants' various challenges, one of which requires an inquiry into the sufficiency of the evidence to establish a criminal enterprise, a detailed review is necessary. The facts are taken primarily from the trial transcript, which is contained in multiple volumes.

### A. King's Cocaine Activities

Defendant King and his partner Rodney Williams operated their first "drug house" at 1103 Oakdale in Springfield, Illinois, in late 1989 and early 1990. The house was located less than 600 feet from a public pre-school. King would drop off cocaine at the house, which "four or five" people, including Williams (his main partner), Donnell Hill, and Ronnie Black, would then sell on his behalf. King would later return to collect the proceeds. King and Williams obtained cocaine from a relative of Williams in Chicago; they pooled their money to buy quarter kilogram amounts, the majority of which was King's. Hill was primarily responsible for packaging the cocaine into $20 bags to be sold at the house. Two individuals who did not work at the house, Troy Powers and Monte Bingham, also sold cocaine for King during this period. King provided them with pre-packaged bags and told them how much money he expected from the proceeds.

In the summer of 1990, Williams went to prison for a parole violation, and King began obtaining cocaine in Springfield from Willis Gragg. During this period, Alonzo Hampton began selling cocaine for King. King at first fronted Hampton $300 bags of cocaine, expecting $200 in return, but later Hampton started purchasing cocaine from King; at times, they pooled their money and bought cocaine together. King and Gragg (his current supplier) had a falling out because Gragg claimed King owed him money for

cocaine, resulting in Gragg's publicly hitting King with a pistol. The next day, King and Hampton, armed with a 9 mm. pistol and a .38 caliber revolver respectively, went looking for Gragg; once located, they both fired, but missed him and fled.

Also during this period, Hill and Bingham accompanied King at his request to East St. Louis to obtain cocaine from a man named "Jonesy." Several trips were made, and each time King paid the others for making the trips. On another occasion, King paid Hill to drive him to Frank Stephenson's house. The three men then proceeded to Aaron Williams' house so that King could administer a beating over a dispute between Williams and King. In late 1990, while the Oakdale drug house was still in operation, another individual—Michael Tate—started working for King.

King finally shut down the Oakdale drug house and opened shop at 411 North 11th Street, a public housing development and the residence of Wes and Dorothy Valentine. King paid the Valentines with cocaine for the use of the house. Hill, Tate, Bingham, Mark Gleghorn, Terry Buchanan, and sometimes Aaron Williams and Wes Valentine sold cocaine for King at the new drug house. King brought cocaine to the house; if it was not already prepackaged, Hill, Tate, Bingham, and sometimes Gleghorn would help King do the honors.

In January 1991, Clifton Jefferson, a high-ranking gang member of the Vice Lords with an impressive reputation for robbing drug dealers, robbed King in front of the 11th Street drug house. King at first refused, but was persuaded to turn over the drug money when Jefferson shot the hat off his head. After the robbery, King told those present in the house—Hill, Bingham, and others—that he would get revenge on Jefferson even if it took two years and that he would get anyone else who crossed him. Hill and Hampton testified at trial regarding the necessity of maintaining a tough image as a drug dealer to prevent frequent robberies. The day after the robbery, King, Hill and Rob Tyler, each carrying a gun, shot up a house they erroneously believed to belong to Jefferson's girlfriend and occupied by Jefferson at the time.

Once operations with "Jonesy" in East St. Louis had ceased, King began pooling money with Patrick Wallace to obtain cocaine from another Chicago source. On several occasions, Hill drove King and Wallace to Chicago where they acquired drugs. Wallace would hand money to one man in a parking lot, and another man would later deliver the drugs. Hill was paid for driving on each occasion. On the last trip, in March 1991, police seized about $60,000 from the courier before the drugs were delivered. Thus ended King's association with Wallace.

King then began obtaining cocaine from "Beeno," another East St. Louis dealer. The list of individuals working with King increased, including during this period Stephenson, Henry Berry, Tate, Hill, Buchanan, and Powers. At some time in early 1991, King began obtaining cocaine from Robert Howell, who obtained the drugs from a David Garcia in Chicago in transactions arranged by Willis Gragg (at whom King and an associate had previously directed gunfire). Gragg went to prison in April 1991, but not before he arranged for his wife Dorothy to substitute as intermediary between Howell and Garcia. Once Garcia had the wherewithal to give Howell his pager number, Dorothy's services were no longer required. It was about this time that "crack" cocaine entered the Springfield drug market. Howell showed King how to produce crack from cocaine so that King could sell his cocaine faster.

The incidents of violence began to increase. In early May 1991, Alfred Dawson robbed Henry Berry as he sold drugs on the street for King. Berry told Dawson that "Richard" (whom Dawson understood to be Richard King) was going to kill Dawson. Two days later, while in a car with Hill and Spencer Harris, King fired several rounds from a Glock 9 mm. semi-automatic pistol at Dawson, hitting him once in the back. King said that he shot Dawson in retaliation for robbing Berry. A day later, the police chased King for another shooting during which King threw the Glock pistol from his car window. The police later recovered it, and all 13 cartridge casings at the scene of Dawson's shooting were traced to the Glock.

In early summer 1991, King again associated with Wallace, who had just been released from a juvenile detention facility. King fronted drugs to Wallace, and Wallace eventually saved enough money to pay cash up front. King told Michael Harris that he intended to use Wallace to convince Wallace's aunt, Dorothy Gragg, to connect with her cocaine source in Chicago. Because King and Willis Gragg had not gotten along (King tried to shoot him), King worried that Dorothy would not help him unless he went through Wallace. King made similar remarks to Hill. King and Wallace became partners, pooling their money and distributing their respective shares through their own dealers.

Howell, who worked with Garcia to obtain drugs, took a month-long vacation to Jamaica in August 1991. Wallace took this opportunity to approach Dorothy Gragg about buying drugs from Garcia in Chicago; Garcia agreed to the sale. Dorothy, Wallace, and King drove to Chicago to obtain the drugs. Dorothy was paid for making the trip. Over a week later, the group made a similar trip to Chicago that also included Aaron Williams. Thereafter, Dorothy made several more trips to pick up drugs for King and Wallace. She became friends with King and Wallace as a result of the regular Chicago runs, and she stated at trial that one could say she worked for King.

During the same period, Stephenson, Tate, and Buchanan also distributed cocaine for King. In the fall of 1991, Hampton began selling cocaine for King again. Michael Harris also admitted that he worked for King because he sold cocaine fronted by King; Harris in turn employed three other people to help produce crack for sale. King instructed Stephenson in the production of crack, and by the end of 1991 Stephenson had four people helping him sell King's crack. The evidence indicated that King was very successful in his dealings: when Howell returned from Jamaica in September 1991, King displayed a stack of bills that he said contained $300,000.

## B. Jefferson's Murder and the Aftermath

Clifton Jefferson, the gang member who had shot off King's hat and robbed him, entered the scene again in fall 1991. Jefferson approached King on the street, apologized for the robbery, and stated that he wanted to clean the slate; King responded that everything was cool and not to worry about it. Afterwards, King told Stephenson that he was glad Jefferson apologized. He believed that Jefferson only intended to rob him again, but now that Jefferson thought they were friends, King could "get him." King was correct about Jefferson's intentions. In late September, Jefferson told Patrick Wallace that he was broke and planned to start robbing drug dealers again, King included. Patrick was concerned because his nephew, Robert Wallace, was King's partner and frequently accompanied King. Patrick told Robert of the plans, and Robert responded that if Jefferson robbed King, King would "do him."

Tate, aware that King wanted revenge on Jefferson, told him that a man with whom he worked, defendant Rogers, would kill Jefferson for $2,000. The three men met to assess Rogers' sincerity. A couple of weeks later, Rogers told Tate that he could have killed Jefferson one night, but that he needed a gun. Tate relayed this information to King, who said he would take care of it. On October 12, 1991, Tate and Bingham were at King's house. Rogers came over and then King and Rogers left together. King returned alone and said that Jefferson would be killed that night. Trevor Robinson testified that Rogers came to his back door at about 10 p.m. that night and said that he planned to kill Jefferson and wanted Robinson to come along. Robinson agreed and the two proceeded to pick up Jefferson in Rogers' car.

Before midnight, Rogers pulled up to a nightclub and went inside, returning with King about five minutes later. The two of them talked for awhile, and Rogers came back to the car. Robinson drove the car, Rogers got into the back seat, and Jefferson sat in the front passenger seat. As they drove around talking, Robinson heard Rogers fire several shots and saw Jefferson's bloody head leaning to the right, where the passenger side window had been shattered.

Rogers gave Robinson directions to an alley where they dumped Jefferson's body. Back at the nightclub, Rogers met with King. Leaving Robinson behind, the two drove off in King's car. They returned about thirty minutes later with Rogers in fresh clothes, picked up Robinson, and drove to a dumpster where they burned Rogers' bloody clothes. King then dropped them off at the nightclub where, at the entrance, Rogers handed Robinson $100 from a large wad of cash. Later that night, Robinson asked Rogers why he killed Jefferson. Rogers replied that "it was a drug hit," that Jefferson "had been robbing King and his boys," and that King paid him to do it.

The following day, Rogers and Robinson arrived at King's house where Rogers' car was parked. The three worked on cleaning the car, which was full of blood, brain matter, and broken glass. Stephenson, who had slept at King's house, witnessed the car, as did Tate and Bingham, who followed King to the car wash. At the car wash, Rogers told Tate that he had done it. He also told Robinson to ask King for some money; King then gave Robinson $1,700. Jefferson's body was also found that morning, and an autopsy determined that he died from three close-range gunshot wounds just behind the left ear. Later that day, Rogers asked Tate to hold a pile of money, about an inch and a half thick, while detectives appeared at Rogers' door. Tate returned the money when the detectives left. Bingham also saw the detectives and reported the incident to King. King said that they could not do anything to him because they had not seen him give Rogers the money.

Later that evening, King, Hill, and Bingham met with Rogers and several worried relatives of Rogers. Rogers talked about turning himself in, but instead agreed to try and cover up the murder. Rogers attempted to square his story with Robinson, and King later told Stephenson of the plan. King at this point told Stephenson that he had paid Rogers $2,000 for the murder and would pay Rogers' lawyer and bond; he said that so long as Rogers did not turn him in, King could not be convicted because no one saw him pay Rogers. That night, Rogers turned

himself in to the police. He stated that Jefferson had pulled a gun on him as they were riding around, that they struggled, and that Jefferson was killed when the gun went off. The detective, knowing three shots had killed Jefferson, arrested Rogers. Robinson also went to the police that night. He initially reported the same false story as did Rogers, but finally told the truth when the detective disbelieved him. He did not mention King for fear of retaliation. Several days later, though, he pointed out King's house to a detective.

Two days after the murder, King and Tate delivered $15,000 to Rogers' aunt to pay for Rogers' lawyer. King returned with Stephenson a few days later to deliver more money to Rogers' girlfriend. An attorney was later retained for Rogers. Records from the attorney's office show that he was paid various sums over a two-week period, never exceeding $9,500 and totalling $19,500. On January 2, 1992, Rogers' aunt posted $3,000 bond and he was released. The evidence at trial showed a correlation between these various payments and activity at a safe deposit box used by King and a correlation between the events described and telephone calls made by King and other witnesses.

During the weeks that followed Rogers' release, Stephenson accompanied King two or three times when he delivered money to Rogers. During one visit, Rogers described to Stephenson how he had killed Jefferson. King then saw one of Jefferson's associates, Maurice Williams, standing outside the window. King said he wanted Williams killed as well, and Rogers offered some ideas on how he (Rogers) might be able to ambush Williams.

### C. King's Continuing Drug Operations and Arrest

On November 25, 1991, Willis Gragg returned from prison and again began making arrangements to buy cocaine from Garcia, which made obtaining cocaine for King more difficult. Since Dorothy Gragg acted as Willis' runner in making the Chicago trips for Garcia, King on one occasion met her in Chicago and gave her $18,500 to buy an additional kilogram for him without Willis

knowing. Michael Harris accompanied Dorothy on that trip. On December 4, 1991, King fronted Stephenson a kilogram of cocaine and said he wanted $36,000 from the proceeds; Stephenson promptly quit his restaurant job. King also distributed cocaine to two other dealers, Terry King and Andre Rye.

In December 1991, prior to Rogers' release, King told Marvin Brown that he was trying to raise money to get Rogers out of jail because he was afraid he would implicate him in the murder. King also asked Brown to kill Rogers when he got out. After Rogers' release, King again asked Brown about murdering Rogers and offered to pay him $5,000 up front and $15,000 more upon execution. Brown never agreed to the plan and was jailed for a firearms charge in February 1992.

On December 7, 1991, King, Hill, and Stephenson saw Michael Harris at Willis Gragg's house with a duffel bag. After leaving, King told the others that Harris had drugs in the bag. Two days later, Tate, Stephenson, and Hill broke into Harris' house and attempted to steal the drugs. They were later arrested and King paid their bond. As a result of the attempted robbery, Harris' brother, Michael Harris, threatened to retaliate against King. Thus King, along with Stephenson, Hill (armed with a 9 mm.), Tate, Robert Wallace (armed with a .45 caliber pistol), and Tony Horton, found Marcus Harris at John Brown's house. When Brown came out to confront them, Wallace fired a round into the ground; both Stephenson and King explained to Brown that they needed to nurture their reputation for retaliation since they were "high rollers" now. The group left, but were confronted by police at King's house. King fought with police and was arrested, only to post bond the following day.

By January 1992, Dorothy Gragg began to make Chicago runs solely for King and Wallace, as she had done when Willis Gragg was in prison. She testified that all of King's money came from drug trafficking during the time she knew him and that he never held a job during that period. In March and April 1992, Lynard Joiner also sold cocaine for King, for which Stephenson helped King collect the proceeds. In April 1992, an undercover government informant bought crack from Michael Tate; the informant then saw King and Hill drive up and saw Tate give the money to King. Also in early 1992, King's house was robbed and he later saw Isaiah Cutler wearing some of his clothes. King offered to pay Hill to beat Cutler up or to assist King in shooting him. The matter was dropped, but not before King discussed killing Cutler with Rogers.

On April 22, 1992, Robert Howell, now acting on behalf of the DEA, arranged a sham sale of three kilograms of cocaine to King through a series of recorded conversations. When King and Dorothy Gragg showed up for the transaction, DEA agents seized over $68,000 from their car, but released the two so the investigation could continue. Dorothy testified that the seized money consisted of equal amounts from King, Robert Wallace, and one of Wallace's uncles. King told Dorothy that he believed Howell had set them up. King offered to pay Hill to shoot Howell; Hill first agreed but later declined. King then told Stephenson that if Howell showed up at a particular dance club that night, they would kill him. King planned to do the killing, but later showed up with someone named "Deke" and said Deke would help Stephenson kill Howell. Stephenson went to the club to look for Howell, but he did not appear and nothing came of the plan.

On April 25, 1992, King sent Dorothy and her sister, Clara Taylor, to Chicago to buy cocaine from Garcia; he agreed to pay Taylor $2,000 for making the trip. The money they took to Chicago included equal amounts from King, Robert Wallace, and Kent Wallace. After checking into a motel, Dorothy paid one of Garcia's runners about $54,000, but the runner never returned with the goods. Dorothy called King in Springfield to break the bad news, and King told her to return with the remaining money, about $25,-000. Shortly after that, King and Wallace again lost money on a drug deal in St. Louis. On May 14, 1992, King and Dorothy were arrested together in her bedroom.

### D. Procedural History

Defendant Rogers was charged with one count of murder in furtherance of a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(e)(1)(A), and one count of murder in aid of racketeering in violation of 18 U.S.C. § 1959. On February 1, 1994, the day the trial was to start, Rogers entered a contingent guilty plea on the charge of murder in aid of racketeering, reserving his right to appeal his motion to dismiss that charge. The motion to dismiss was based on the alleged failure of the government to establish a RICO "enterprise" and had been denied by the district court. Rogers was sentenced to 360 months in prison.

Defendant King was charged with one count of engaging in a CCE (21 U.S.C. § 848(a)), one count of murder in furtherance of a CCE (21 U.S.C. § 848(e)(1)(A)), one count of murder in aid of racketeering (18 U.S.C. § 1959), two counts of maintaining a drug house (21 U.S.C. § 856(a)(1)), one count of distributing drugs within 1,000 feet of a school (21 U.S.C. § 860(a)), two counts of employing a juvenile to commit a drug offense (21 U.S.C. § 861(a)(1)), four counts of distributing drugs to a minor (21 U.S.C. § 859(a)), four counts of possessing cocaine with intent to distribute (21 U.S.C. § 841(a)(1)), and one count of distributing cocaine base (21 U.S.C. § 841(a)(1)). The trial began on February 1, 1994. The government moved to dismiss one of the counts involving employment of a juvenile at the close of its case, and the jury returned guilty verdicts on the remaining counts. King was sentenced to life imprisonment.

### II.

The defendants raise four issues on appeal: first, whether there was sufficient evidence to support King's conviction for engaging in a CCE; second, regarding both defendants' racketeering convictions, whether the drug enterprise must have had a goal in addition to drug dealing to qualify as a racketeering "enterprise" and whether substantial evidence supported the convictions; third, whether certain of King's convictions are constitutionally infirm because Congress lacked authority to regulate drug possession near schools, involving drug houses, or affecting minors; fourth, whether King was denied a fair trial.

### A.

■ Defendant King first challenges the sufficiency of the evidence to support his conviction for engaging in a CCE. His conviction for murder in furtherance of a CCE, though not directly challenged by King, is also necessarily predicated upon the existence of a CCE. We review the evidence in the light most favorable to the government and ask whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560. This Court will reverse a conviction "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez,* 978 F.2d 1463, 1468–1469 (7th Cir.1992); see also *United States v. Hickok,* 77 F.3d 992, 1002 (7th Cir.1996), certiorari denied, —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800.

■ The CCE statute, 21 U.S.C. § 848, requires proof of five elements: (1) a violation of the federal narcotics laws; (2) which crime is part of a series of violations of the federal narcotics laws; (3) undertaken by the defendant and at least five other individuals; (4) with respect to whom the defendant holds a supervisory, managerial, or organizational role; and (5) from which the defendant receives substantial income or resources. *United States v. Moya–Gomez,* 860 F.2d 706, 745 (7th Cir.1988), certiorari denied, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571. King challenges only the last three of these elements. With respect to the third and fourth elements, the government need not show that the five individuals "acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of [them]." *Id.* at 746 (quoting *United States v. Possick,* 849 F.2d 332, 335–336 (8th Cir.1988)). The government must only show that the defendant exerted some

type of influence over five other individuals in the course of the criminal enterprise. *Id.*; *United States v. Gibbs,* 61 F.3d 536, 538 (7th Cir.1995), certiorari denied, —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446.

■ The evidence is sufficient to establish that King exercised a supervisory, managerial, or organizational position in the criminal enterprise with respect to at least five other individuals. There is no need to recount all of the facts detailed above. Suffice it to say that nine people who worked for King testified at trial, and those nine testified about at least eighteen others who did so as well. His managerial function was also well established by the evidence. He controlled the actions of other individuals by demanding a certain percentage of proceeds from drug sales; he paid individuals at various times for their services, whether it was for accompanying him on a trip to acquire drugs or on a trip to beat up an enemy; and King controlled those who worked for him by using violence to generate a reputation as someone who would not tolerate dissent. A managerial role is established by showing that a defendant exerts influence over other individuals as exemplified by the other individuals' compliance with the defendant's directions, instructions, or terms. *Moya–Gomez,* 860 F.2d at 746. King's assertion that he merely controlled or managed the property, assets, and drugs (rather than people) used in the conspiracy is contradicted by the evidence.

■ As to the fifth element, King argues that the government must prove that he received substantial income not only from the narcotics offenses, but also from the concerted activity of five or more other persons. The argument ignores the plain language of the statute. Section 848(c) states,

[A] person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). The statute relates the substantial income requirement in Section 848(c)(2)(B) only to the series of narcotics violations and not to the other elements contained in Section 848(c)(2)(A). Thus the evidence need only show that King obtained substantial income from the series of narcotics violations, and based on the facts detailed above—including testimony from Dorothy Gragg that King never held a job—we have little difficulty concluding that a rational juror could so find.

### B.

■ Defendants King and Rogers next argue, regarding their racketeering convictions, that the drug enterprise must have had a goal "separate and apart" from drug dealing to qualify as a racketeering "enterprise." They further contest the sufficiency of the evidence. Under the applicable statute, " 'enterprise' includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). This definition of "enterprise" is the same as that used in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(4) ("RICO"). *United States v. Concepcion,* 983 F.2d 369, 380–381 (2d Cir.1992), certiorari denied, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). Section 1959 was enacted to complement RICO. It allows the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise, but also to prosecute for violent crimes intended, among other things, to permit a defendant to maintain his position in a RICO enterprise. *Id.* We thus draw on cases decided under Section 1961(4) to determine what constitutes an enterprise under Section 1959.

The defendants' argument that their drug enterprise must have had a goal "separate and apart" from drug dealing in order to be a racketeering enterprise stems from language in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246. In *Turkette*, the Supreme Court decided that a RICO "enterprise" is not limited to legitimate enterprises, but includes illegitimate enterprises that have an exclusively criminal purpose. The language on which defendants rely is as follows:

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." ... The [enterprise] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The [pattern of racketeering activity] is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. *The enterprise ... is an entity separate and apart from the pattern of activity in which it engages.*

*Id.* at 583, 101 S.Ct. at 2528–2529 (emphasis added). Defendants read this language as requiring the enterprise to have a *purpose* separate and apart from the pattern of racketeering activity. The position is simply insupportable. The Court was merely emphasizing that proof of an enterprise is separate and apart from proof of a pattern of racketeering activity. Thus the two *elements* are separate and apart, and "the proof used to establish these separate elements may in particular cases coalesce...." *Id.*

Defendants also draw some support from two opinions of this Court. In *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir. 1986), certiorari denied, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372, we noted, citing *Turkette* and other cases, that an "enterprise must be more than a group of people who get together to commit a 'pattern of racketeering activity.'" We then adopted the following language from *United States v. Anderson*,

626 F.2d 1358, 1372 (8th Cir.1980), certiorari denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336:

> We hold that Congress intended ... "enterprise" ... to encompass only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the "pattern of racketeering activity."

791 F.2d at 500. Then in the later case of *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir.1991), certiorari denied, 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105, we stated that the enterprise must exist "as an organization with a structure and goals separate from the predicate acts themselves."

These cases do not support defendants' theory. First, in light of *Turkette, Neapolitan* and *Masters* can only be read as emphasizing the need to prove both the existence of an "enterprise" and a "pattern of racketeering activity" as separate elements. Second, the language in *Neapolitan* taken from *Anderson* that suggests the enterprise must have an economic goal separate and apart from the predicate acts was later rejected by the Supreme Court. *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (reversing this Court's decision in *National Org. for Women v. Scheidler*, 968 F.2d 612 (7th Cir.1992)). In *Scheidler*, the Court held that an enterprise need not have an economic motive. Third, neither *Neapolitan* nor *Masters* turned on the question whether the government proved goals of the enterprise separate and apart from the predicate acts. For example, *Neapolitan* was exclusively concerned with distinguishing "enterprise" from "conspiracy." Thus taking isolated passages from the opinions, as defendants do, and construing them as strictly as one might construe a statute yields little that is persuasive. Both opinions contain language supporting the position, arguably incontestable after *Turkette*, that "enterprise" is an *element* separate and apart from proof of the predicate acts and from other elements. From *Neapolitan*:

The government must establish the conspiracy and the enterprise and, in those cases where the enterprise is alleged to be an illegal association-in-fact, proof of one is not sufficient to allow an inference of the existence of the other.

791 F.2d at 500. And from *Masters*:

The most difficult issue relating to enterprise and pattern [of racketeering activity] in this case is whether the two are separate. If the "enterprise" is just a name for the crimes the defendants committed, or for their agreement to commit these crimes that was charged separately in the conspiracy count, then it would not be an enterprise within the meaning of the statute [citing *Turkette* and *Neapolitan*]. Otherwise two statutory elements—enterprise and pattern-would be collapsed into one.

924 F.2d at 1367.

Finally, it would be nonsensical to require proof that an enterprise had purposes or goals separate and apart from the pattern of racketeering activity. We know from *Turkette* that "enterprise" includes illegal organizations, or illegal associations-in-fact, that have an exclusively criminal purpose. Thus it cannot be the case that to prove "enterprise," the government must prove that the group of individuals engages in some other legitimate activity. The government would not have to show, for example, that King and Rogers had a legitimate business with the other witnesses who also distributed cocaine on the side. No doubt proof of a legitimate business would be highly probative as to the "enterprise" element, but after *Turkette* we cannot say that it is required. So must the government prove other *illegal* purposes? If so, they would have to be illegal purposes that are not predicate acts, because under defendants' theory the purposes must be "separate and apart" from the predicate acts. Requiring proof of additional unlawful purposes that are not predicate offenses would be absurd; it would also run counter to the obvious rationale behind defendants' argument: that an "enterprise" is something more structured, more organized than a band of criminals. As we said in *Masters*, "[i]t would be ironic if the RICO statute, aimed primarily at criminal enterprises such as the

Mafia and its many petty imitators, was more effective against legal enterprises because the latter have a more perspicuous, articulated structure." 924 F.2d at 1367.

■ In holding that proof of an "enterprise" is merely an element separate and apart from proof of the offensive acts—here the drug activity—we are mindful that RICO, and by implication the definition of "enterprise" in Section 1959, "is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–498, 105 S.Ct. 3275, 3285–3286, 87 L.Ed.2d 346. Defendants' suggestion that we are not merely reading the statutes broadly, but rendering the "enterprise" element superfluous is unfounded. As a separate element, "enterprise" still requires more than a "pattern of racketeering activity." We will turn to those requirements in a moment, but the fact that a single individual may engage in a pattern of racketeering activity without, of course, comprising an enterprise adequately illustrates the inherent and logical distinction between the two elements.

■ Defendants next contest the sufficiency of the evidence to prove the existence of an "enterprise." The hallmark of an enterprise is "structure." *Neapolitan*, 791 F.2d at 500. It includes informal organizations such as criminal gangs, and "[t]here must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much." *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir.1994) (quoting *Burdett v. Miller*, 957 F.2d 1375, 1379 (7th Cir.1992)), certiorari denied, — U.S. —, 115 S.Ct. 496, 130 L.Ed.2d 406. "A RICO enterprise is 'an ongoing "structure" of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.'" *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995) (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir.1990)). The continuity of an informal enterprise and the differentiation among roles can provide the requisite "structure" to prove the element of "enterprise." 29 F.3d at 1117–1118. The facts as detailed above need not be repeated. A rational jury could

reasonably find from the evidence that the various individuals were joined in purpose, with hierarchical and sometimes consensual decision-making, that the organization was continuous, and that it included differentiated roles among its members.

Based on the foregoing, the district court properly instructed the jury as to the law regarding "enterprise" in King's trial and properly refused to dismiss the indictment against Rogers. Further, the record contained substantial evidence that an enterprise existed.

### C.

Third, defendant King argues that certain of his convictions are constitutionally infirm because Congress lacks authority to regulate drug possession near schools, drug offenses involving drug houses, or drug offenses affecting minors. King admits that the Commerce Clause challenge was not made before the district court, but asks this Court to reach the issue in light of *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626, which was decided after his conviction. *Lopez* purportedly did not change existing law and therefore should not excuse King's failure to raise the argument below. *United States v. Baucum*, 66 F.3d 362, 363–364 (D.C.Cir.1995). Nonetheless, we will review the district court's decision for plain error. *United States v. Olano*, 507 U.S. 725, 731–732, 113 S.Ct. 1770, 1776–1777, 123 L.Ed.2d 508.

■■■ *Lopez* is clearly distinguishable from the present case. The Supreme Court in *Lopez* struck down the Gun–Free School Zones Act of 1990 because it was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." —— U.S. at ——–——, 115 S.Ct. at 1630–1631. Unlike possession of firearms, which the Gun–Free School Zones Act proscribed, drug dealing is an economic activity that affects interstate commerce. Even King acknowledges Congress' authority to criminalize and punish drug-related activity, but he argues that the Commerce Clause does not permit Congress to impose greater punishment for drug activity that affects mi-

nors, takes place near schools, or involves a drug house. Courts have uniformly upheld regulation of drugs near schools. See *United States v. Clark*, 67 F.3d 1154, 1165–1166 (5th Cir.1995), certiorari denied, —— U.S. ——, 116 S.Ct. 1432, 134 L.Ed.2d 554; *United States v. McDougherty*, 920 F.2d 569, 572 (9th Cir.1990), certiorari denied, 499 U.S. 911, 111 S.Ct. 1119, 113 L.Ed.2d 227; *United States v. Thornton*, 901 F.2d 738, 741 (9th Cir.1990); see also *United States v. Lopez*, 2 F.3d 1342, 1366–1367 n. 50 (5th Cir.1993), affirmed, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626. Given Congress' broad authority to regulate drug activity, we see no basis for distinguishing the other statutes under which King was convicted from the school statute. We thus find no plain error in King's convictions.

### D.

■■■ Finally, defendant King argues that the cumulative effect of several errors denied him a fair trial. We have on several occasions expressed disapproval of this type of "buckshot" approach in which defendant has only a mere hope that a pellet will strike. *United States v. Boyles*, 57 F.3d 535, 549 (7th Cir.1995); *United States v. Balzano*, 916 F.2d 1273, 1297–1298 (7th Cir.1990). Nonetheless, this Court has recognized that the cumulative effect of trial errors may deprive a defendant of his constitutional right to a fair trial. *United States v. Haddon*, 927 F.2d 942, 949 (7th Cir.1991). In considering a cumulative effects argument, we recognize that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one," *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460, and we will not upset a guilty verdict where the record fairly demonstrates the defendant's guilt such that none of the asserted errors, either individually or cumulatively, could possibly have influenced the jury to reach an improper result. *Haddon*, 927 F.2d at 951. At the very least, to succeed on a cumulative effects theory a defendant would have to "prevail on *at least* one of his challenges." *United States v. Akinsanya*, 53 F.3d 852, 859 (7th Cir.1995) (emphasis added).

With these principles in mind, we may quickly dispose of King's remaining arguments. King first argues that the district court improperly instructed the jury that a defendant could be guilty of aiding and abetting a CCE, a racketeering enterprise, and a CCE murder. King cites no portion of the record nor any authority to support his claim, and we will therefore not address the merits of his argument. See *Boyles,* 57 F.3d at 549 (citing cases for the proposition that summary arguments unsupported by authority are waived). King next argues regarding his drug house conviction that the government failed to prove that he both opened and maintained a drug house. However, the statute makes it unlawful to "knowingly open or maintain" a drug house. 21 U.S.C. § 856(a)(1) (emphasis added). King next argues, apparently against his attorney's advice, that he was subject to double jeopardy based on the administrative forfeiture of his car and some currency. His attorney's own analysis amply demonstrates the futility of the argument, as does the recent case of *United States v. Ursery,* — U.S. —, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) (holding that civil forfeitures are neither "punishment" nor criminal for purposes of the Double Jeopardy Clause).

King further contends that he cannot be convicted of both engaging in a CCE and the underlying predicate elements of the CCE. The Supreme Court held to the contrary, however, in *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764. King's argument misreads the holding of *United States v. McManus,* 23 F.3d 878 (4th Cir.1994). There the court held only that a conspiracy conviction used as a lesser included offense of a CCE conviction must be vacated, not that all predicate offense convictions must be vacated. *Id.* at 884. Finally, King objects to the admission of statements made by Jefferson, the murder victim, to Patrick Wallace to the effect that Jefferson intended to rob King again. We agree with the government that these statements were properly admitted to establish King's motive for having Jefferson killed, though they would have been improper to prove the truth of the matter asserted—that Jefferson actually intended to rob King again. Even assuming error, it was harmless given other evidence of Jefferson's intent: Patrick Wallace passed the information on to Robert Wallace who subsequently told Patrick that if Jefferson robbed King, King would "do him."

## III.

For the foregoing reasons, we AFFIRM the district court's conclusions as to both defendants.