**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Larry McKINNEY, Defendant–Appellant.**

No. 95–3105.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1996.

Decided Oct. 23, 1996.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Larry McKinney of conspiracy to distribute cocaine, distribution of cocaine, and distribution of cocaine within 1000 feet of a public school. Before trial, through a motion to dismiss, McKinney challenged as unconstitutional one of the statutes under which he was later convicted. Citing *United States v. Lopez,* — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), McKinney argued Congress exceeded its authority under the Commerce Clause of the United States Constitution when it created a harsher penalty for those convicted of distribution of controlled substances within 1000 feet of a school (the "Schoolyard Statute"). The district court denied McKinney's motion and he appeals that denial. McKinney also challenges his sentence, claiming the court failed to make explicit findings required by the Guidelines as to the amount of drugs that could be attributed to him and his role in the offense. We affirm the district court in both instances.

## I. Commerce Clause

A twelve-count indictment charged McKinney and nine codefendants with conspiracy to distribute cocaine and various substantive cocaine distribution offenses. In addition to conspiracy, McKinney was charged with one count of distribution and two counts of distribution within 1000 feet of a school. In the first of the latter two charges, police videotaped McKinney selling 4.12 grams of crack cocaine "right next door" to a public elementary school. In the second, police monitored and audiotaped McKinney as he sold 26.76 grams of cocaine powder "within 158 feet" of Centralia Public High School.

Title 21 U.S.C. § 860(a) makes it a crime, *inter alia,* to distribute or possess with the intent to distribute a controlled substance within 1000 feet of a public school. Distribution and possession with intent to distribute are already crimes, *see, e.g.,* 21 U.S.C. §§ 841(a)(1) & 846, but the penalty for doing so in proximity to a school is twice what it would be beyond the 1000-foot zone sur-

Robert Lee Garrison (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Renee E. Schooley (argued), Office of the Federal Public Defender, East St. Louis, IL, for Defendant–Appellant.

rounding the school. McKinney argues that Congress has no authority under the Commerce Clause to pass such a law. In support of this argument he cites *United States v. Lopez,* — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Supreme Court held that the Commerce Clause does not provide Congress the authority to prohibit the possession of a firearm within 1000 feet of a public school (the "Gun–Free School Zones Act of 1990" [1]).

## A. *United States v. Lopez*

Every circuit court to consider such a challenge to the Schoolyard Statute, including ours, has upheld the statute as a lawful exercise of Congress' Commerce Clause powers. *See United States v. Zorrilla,* 93 F.3d 7, 8–9 (1st Cir.1996); *United States v. Clark,* 67 F.3d 1154, 1165–66 (5th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1432, 134 L.Ed.2d 554 (1996); *United States v. Tucker,* 90 F.3d 1135, 1139–41 (6th Cir.1996); *United States v. Rogers,* 89 F.3d 1326, 1338 (7th Cir.1996); *see also, United States v. Garcia–Salazar,* 891 F.Supp. 568, 569–72 (D.Kan.1995); *United States v. Lopez,* 2 F.3d 1342, 1366 n. 50 (5th Cir.1993), *aff'd,* — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (noting the differences between 18 U.S.C. § 922(q), the Gun–Free School Zones Act, and 21 U.S.C. § 860, the Schoolyard Statute). In *Rogers,* we were confronted with a narrower constitutional challenge. The defendant claimed generally that, following *Lopez,* Congress could not impose greater punishment for drug activity that affects minors or takes place near schools. Because the issue had not been raised below, we reviewed for plain error only. In a brief analysis this court distinguished the Supreme Court's holding in *Lopez* from the claims the defendant made in *Rogers,* noting that drug dealing is an economic activity that affects interstate commerce, and that "courts have uniformly upheld regulation of drugs near schools." 89 F.3d at 1338. McKinney submits a broader challenge, fully briefed and argued below, claiming that the statute does not meet the *Lopez* requirement of linking the prohibited activity to interstate commerce through either case-by-case or Congressional findings. McKinney maintains that trafficking in controlled substances near schools does not affect interstate commerce any more than trafficking elsewhere.

In *Lopez,* the Supreme Court held that Congress exceeded the powers granted to it by the Commerce Clause of the Constitution when it enacted the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q). In doing so it reiterated that "[t]he powers delegated by the [ ] constitution to the federal government are few and defined." *Lopez,* — U.S. at —, 115 S.Ct. at 1626 (quoting The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961)). After an extensive review of case law tracing the development and expansion of the Commerce Clause power of Congress, the Court identified three categories of activity that Congress had authority to regulate: "[f]irst ... the use of the channels of interstate commerce"; "[s]econd ... the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and third, "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Lopez,* — U.S. at — – —, 115 S.Ct. at 1629–30.

Evaluating the Gun–Free School Zones Act under the third category, the Court emphasized that even where an activity affected commerce, for Congress to exercise authority over the activity it must "substantially affect" rather than just "affect" interstate commerce. *Id.* at — – —, 115 S.Ct. at 1629–30. Because the act was "a criminal statute that by its own terms had nothing to do with 'commerce' or any sort of economic enterprise," and because it was not "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated," the Court concluded that the

---

**1.** Both the statute under challenge in *Lopez* and the statute under challenge in this case deal with activities within a 1000-foot zone surrounding a school. This opinion will refer to the statute overturned in *Lopez* by the title of its enacting legislation, the "Gun–Free School Zones Act," and the statute under challenge here by its popular name the "Schoolyard Statute." U.S.C.A., Popular Name Table for Acts of Congress, pp. 1177, 1483 (1996).

statute could not "be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at ———, 115 S.Ct. at 1630–31.

The Court also recognized that § 922(q) "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at ———, 115 S.Ct. at 1631. Finding no interstate jurisdictional element, the Court examined the statute's legislative history for evidence of a commercial nexus. While congressional findings are not necessary for a statute to survive a constitutional challenge, the Court noted their absence from the Gun–Free School Zones Act and observed that such findings enable it "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye...." *Id.* at ———, 115 S.Ct. at 1632. The Court rejected the government's argument that Congress has "accumulated institutional expertise regarding the regulation of firearms through previous enactments," which would permit the "importation of previous findings." *Id.* This was especially inappropriate where the new legislation "represents a sharp break with prior firearm regulation." *Id.*

■ The government proposed several theories connecting interstate commerce with firearms possession and school zones, linking gun possession to violence and violence to the national economy, either by increased insurance costs, decreased interstate travel, or threatened learning environments. The Court rejected these attenuated interstate commerce connections. It was unwilling to "pile inference upon inference" in order to extend to Congress power under the Commerce Clause where doing so "would bid fair to convert Congressional authority under the Commerce Clause to a general police power of the sort retained by the states." *Id.* at ———, 115 S.Ct. at 1634. *Lopez* instructs that the courts may not construct attenuated justifications for expanding further the authori-

ty of Congress under the Commerce Clause. And that is what McKinney argues the court must do to uphold the Schoolyard Statute.

## B. The Schoolyard Statute

■ Even with the careful scrutiny *Lopez* instructs us to give to criminal statutes purportedly deriving from Congress' Commerce Clause authority, the statute governing drug transactions within school zones falls comfortably within that authority. Unlike the statute in *Lopez*, which was "a criminal statute that by its terms [had] nothing to do with 'commerce' or any sort of economic enterprise," —— U.S. at ———, 115 S.Ct. at 1630–31, the statutes prohibiting trafficking of controlled substances deal directly with commerce. To the extent these statutes control intrastate commerce, they do so as an integral and necessary part of the overall effort to regulate the interstate and international traffic in controlled substances. It is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at ———, 115 S.Ct. at 1631. On its face, unlike *Lopez* which regulated mere possession of a firearm, the Schoolyard Statute "addresses a clearly commercial activity that has long been within federal power to regulate." *United States v. Tucker,* 90 F.3d at 1140. Because in *Lopez* Congress lacked direct or Commerce Clause authority over the activity itself, the federal government tried to link its authority to prohibit the personal possession of a firearm to a Commerce Clause connection with the school zone. This demanded attenuated unconvincing connections between education and commerce which the Supreme Court rejected as requiring it "to pile inference upon inference." *Lopez,* —— U.S. at ———, 115 S.Ct. at 1634. Congress had Commerce Clause authority neither over possession of guns nor over school zones. Here, in contrast, the nexus between interstate commerce and the sale of drugs within school zones rests firmly on "the interstate nature of the *illegal drug trade,* not of the educational process." *United States v. Tucker,* 90 F.3d at 1140 (emphasis in original).

McKinney focuses on the fact that, like the Gun–Free School Zones Act, the Schoolyard Statute itself contains no legislative history linking the prohibited activity to interstate commerce. *Lopez* established that "where the legislative history is silent, a substantial interstate commerce nexus must be 'visible to the naked eye' without resorting to 'piling inference upon inference' until nothing is left of state autonomy." *United States v. Kenney,* 91 F.3d 884, 888 (7th Cir.1996) (quoting *Lopez,* — U.S. at —, —, 115 S.Ct. at 1632, 1634). This is what, McKinney argues, the court would be required to do to uphold the Schoolyard Statute. However, contrary to McKinney's position, explicit congressional findings support the interstate commerce nexus to narcotics trafficking. The Schoolyard Statute is part of Title 21, Chapter 13 of the United States Code, Sections 801, *et seq.* Section 801 sets out a number of congressional findings and declarations which pertain to the entire chapter and to federal regulations of controlled substances in the United States. Among those, Congress found that:

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow ... nonetheless have a substantial and direct effect upon interstate commerce because—

(A) ... many controlled substances are transported in interstate commerce,

(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, ...

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from [those] manufactured and distributed interstate.

\* \* \* \* \* \*

(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

21 U.S.C. § 801.

Thus, unlike in *Lopez,* Congress has provided findings concerning the impact intrastate distribution and possession with intent to distribute of controlled substances has on national and international distribution of such substances. Control of one is fundamentally necessary to control the other. "This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent." *Stafford v. Wallace,* 258 U.S. 495, 521, 42 S.Ct. 397, 403–04, 66 L.Ed. 735 (1922); *see also Lopez,* — U.S. at — n. 2, 115 S.Ct. at 1629 n. 2 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.") (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 311, 101 S.Ct. 2389, 2391, 69 L.Ed.2d 1 (1981) (Rehnquist, J., concurring in judgment)). But unlike otherwise lawful possession of a firearm in a school zone, the connection between the local and the international commerce in controlled substances is readily apparent, even had Congress not explicitly spelled it out in § 801. We need not "pile inference upon inference" to establish this nexus.

However, McKinney's challenge focuses not only on Congress' Commerce Clause authority to regulate or prohibit drug trafficking generally, but also on its authority to create harsher statutory penalties for doing so in school zones. Yet the same nexus connects the Commerce Cause with sales in school zones as with sales anywhere else. "[D]rug trafficking affects interstate commerce ... It would be highly illogical to believe that such trafficking somehow ceases to affect commerce when carried out within 1000 feet of a school. There is no legal reason why Congress cannot choose to punish some behavior affecting commerce more harshly than other behavior based upon its detriment to society." *United States v. McDougherty,* 920 F.2d 569, 572 (9th Cir. 1990), *cert. denied,* 499 U.S. 911, 111 S.Ct.

1119, 113 L.Ed.2d 227 (1991) (citations omitted). Young students are more vulnerable to the tantalizing promises of drug pushers. Enhanced punishment of those who take advantage of this youthful vulnerability is certainly warranted. Turning off the flow of drugs at this early stage with an extra twist of the faucet is something Congress can surely do to minimize one of society's most serious ills. "The fact that Congress chose in § 860 to heighten the punishment for drug dealers who operate near a school ... does not remove its basis for federal jurisdiction." *United States v. Tucker,* 90 F.3d at 1140–41 (citing *United States v. Clark,* 67 F.3d at 1165–66). The same findings that authorize the federal government to regulate all commerce in controlled substances support its authority to regulate a subset of commerce in controlled substances. The narcotics sold in school zones are as likely to have traveled in interstate or international commerce, or are as likely to have an effect on that commerce, as the narcotics sold anywhere else. As Congress has authority to prohibit the activity in question, commerce in narcotics near schools, it may do so with a separate statute (separate from the general prohibition on drug trafficking), and it may set a penalty different from the statute banning such sales in general. The Commerce Clause does not require that Congress punish all such behavior the same.

Finally, in the Gun–Free School Zones Act, Congress attempted to make illegal in certain areas within a state what was otherwise legal (if not constitutionally protected conduct), the personal possession of a firearm. In contrast, the Schoolyard Statute prohibits distribution and attempted distribution of narcotics, an activity which is neither legal nor constitutionally protected anywhere, much less within 1000 feet of schools.

## II. Sentencing Issues

### A. Relevant Conduct

 The Sentencing Guidelines require the district court to determine the defendant's relevant conduct, defined as "all acts and omissions committed, aided, abetted, considered, commanded, induced, procured, or willfully caused by the defendant; and in the case of a [conspiracy] ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(A) & (B). A drug conspirator is held accountable "for all drug transactions that he was aware of or that he should have reasonably foreseen." *United States v. Edwards,* 945 F.2d 1387, 1394 (7th Cir.1991), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992) (quoting *United States v. Guerrero,* 894 F.2d 261, 267 (7th Cir.1990)). Thus, in sentencing defendants for a drug distribution conspiracy the district court must determine which transactions each defendant was aware of or reasonably should have foreseen. The government must establish by a preponderance of the evidence the quantity of drugs that was reasonably foreseeable to each particular defendant. *United States v. Banks,* 78 F.3d 1190, 1205 (7th Cir.1996).

 In McKinney's case, the presentence report attributed to him, as relevant conduct, "at least 1852.79 grams" of cocaine. McKinney objected to the quantity of cocaine sales attributed to him. But the quantity was supported by the trial evidence and included cocaine sales witnessed by undercover police officers, sales to witnesses, sales admitted by McKinney in conversations surreptitiously recorded by the police, testimony by witnesses concerning trips to St. Louis planned by McKinney to purchase cocaine, and sales by dealers whom McKinney supplied. Although this evidence is summed up in five pages of the government's appellate brief, it is noticeably lacking in the transcript of the sentencing proceeding. For the sake of judicial economy and a proper focus for this portion of the appeal, it is a far better practice for the district court to explicitly state on the record the relevant conduct for which a defendant is being sentenced. However, "when a district court fails to make specific findings to support its determination of foreseeability, a resentencing is not required in every case." *United States v. De-Priest,* 6 F.3d 1201, 1213 (7th Cir.1993).

Here the challenge to the quantities in the presentence report precipitated an addendum to that report and an evidentiary hearing at sentencing. At the sentencing hear-

ing, the court heard extensive and detailed testimony from Illinois State Police Inspector Alan Rose concerning the quantity of cocaine, both powder and base, for which McKinney could reasonably be held responsible. Inspector Rose totaled it at 1852 grams which included 37 grams of cocaine base, the rest being powder, and an additional 63 grams of base that had not been added into the 1852 gram figure. Immediately following McKinney's cross-examination of Rose, and argument by both sides, the district court overruled defendant's objections to the quantity determination in the presentence report and sentenced him based on the 1852.79 grams. The court did so by explicit reference to its examination of the presentence report, the evidence adduced at the sentencing hearing, as well as the arguments of counsel. In the context of this particular sentencing hearing, there is no doubt that the district court considered as relevant conduct the evidence provided in the presentence report and by Inspector Rose at the sentencing hearing. *See United States v. Fulford*, 980 F.2d 1110, 1117 n. 4 (7th Cir. 1992) ("We note that because the details relating [the sentencing] factors are in the record, notably in the presentence report, it is clear that the district judge considered the factors.")

■ A district court's determination that the government has met its burden of proving the relevant conduct to support the sentence "is a finding of fact which we will reverse only if it is found to be clearly erroneous." *United States v. Mojica*, 984 F.2d 1426, 1443 (7th Cir.1993). "A finding of fact is clearly erroneous only if, after reviewing the entire evidence, we are left 'with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989), in turn quoting *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Based on the record before us we are left with no such conviction. Ample evidence exists in the record supporting the district court's decision to adopt the drug quantities attributed to McKinney in the presentence report and at the sentencing hearing and to sentence him accordingly.

## B. Role in the Offense

■ McKinney likewise objected that the presentence report termed him an organizer or leader, justifying a two-point upward adjustment. Sentencing Guideline § 3B1.1 instructs the district court to increase by two the offense level where the defendant was "an organizer, leader, manager, or supervisor." McKinney argues he was none of these, instead characterizing his activities as that of "a distributor and nothing else." The presentence report concluded McKinney was the "most culpable" of the ten codefendants and that he had "obtained all of the cocaine and redistributed it to the other nine defendants." After McKinney objected, the "Addendum to the PSR," discussed above, bolstered its earlier conclusion: "[McKinney] is viewed as a leader in the instant offense. [He] would rent the vehicles to transport large quantities of cocaine from St. Louis, Missouri to the Centralia, Illinois area. The defendant would then supply [the] coconspirators with the drug to use as well as [to] distribute in the community." Trial testimony as well as the testimony of Inspector Rose at the sentencing hearing revealed that buyers would often page McKinney for cocaine deliveries and someone other than McKinney would show up with the cocaine. Evidence revealed at least three other persons who delivered cocaine for McKinney. The sentencing court could reasonably infer that McKinney was dispatching the couriers who delivered the cocaine and that he thus exercised control over them.

■ While McKinney challenges the finding that his role in the offense required the upward adjustment, his appeal focuses on the lack of explicit findings by the court rather than on whether the conduct described above warrants the two-level increase. He urges that we follow the Sixth Circuit in *United States v. Odom*, 13 F.3d 949 (6th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 116, 130 L.Ed.2d 62 (1994), which remanded a defendant's sentence where the sentencing court made no findings and set forth no reasons for applying the enhancement. *Id.* at 960–61. We decline to do so, as this circuit has already held otherwise. Un-

der the Federal Rules of Criminal Procedure the sentencing court is required to make findings as to each factual matter in the presentence report controverted by the defendant. Fed.R.Crim.P. 32(c)(3)(D). "While '[e]xplicit findings are generally required [under Rule 32] ... there are no "magic words" a court must use; so long as it actually resolves the disputed issues on the record, a sentencing court fulfills the purpose of Rule 32.'" *United States v. Taylor,* 72 F.3d 533, 546–47 (7th Cir.1995) (quoting *United States v. Coonce,* 961 F.2d 1268, 1278 (7th Cir. 1992)). This circuit has held that this rule can be satisfied in certain instances by making reference to the presentence report. See *Taylor, id.* (discussing cases). This is especially so where the defendant has merely objected to the report, as here, without offering evidence of any inaccuracy in that report. *Id.* at 547. Even when the district court has failed to make specific findings with regard to a defendant's role as a leader or organizer, we have affirmed where "the record adequately supports such a determination." *United States v. Carson,* 9 F.3d 576, 585 (7th Cir.1993). In this case, just as with the issue of foreseeability of drug transactions discussed above, the district court had heard all of the testimony and seen all of the other evidence at the trial of the conspiracy setting out the roles the various defendants played in that conspiracy. It also had the initial presentence report. Following McKinney's objection, the court had an addendum to the presentence report which considered and refuted those objections. Finally, immediately before pronouncing the sentence, the court had additional testimony introduced by the government from Inspector Rose reiterating all of the evidence supporting the sentencing recommendation. Thus, when the court stated that based on the presentence report and the evidence adduced at the sentencing hearing it was overruling McKinney's objection, it did so in a context which informs this court that it was adopting as its own the factual findings found in both. Those findings are supported by the record to which they refer.

### III. Conclusion

The district court correctly denied McKinney's motion to dismiss portions of the indict-ment on the theory that Congress does not have the authority under the Commerce Clause to enhance the punishment for sales of controlled substances in school zones. Sufficient support exists for the district court's two-level adjustment for McKinney's role in the offense. Also, sufficient record evidence exists to support McKinney's sentence, and as discussed above, the law permits us to affirm the drug quantity findings underpinning that sentence. Nevertheless, as we have held in the past, the required course (with limited case-specific exceptions) is for the district court to place such findings in the sentencing record for our review on appeal. *See, e.g., United States v. DePriest,* 6 F.3d at 1213 ("the court must make an explicit finding as to the drug quantity and offense level and how it arrived at the sentence"); *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993) ("district court must be precise in explaining the basis for specific factual findings"). We admonish all sentencing courts to carefully follow this procedure to ensure efficient review of sentences.

Accordingly, we AFFIRM the district court.