151 F.3d 1034
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Salvatore CECOLA, Defendant-Appellant.
 No. 97-3523.
 United States Court of Appeals, Seventh Circuit.
 Argued June 10, 1998.
Decided June 30, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division No. 96 CR 248 Charles P. Kocoras, Judge.
 Before Hon. JESSE E. ESCHBACH, Hon. FRANK H. EASTERBROOK, Hon. DANIEL A. MANION, Circuit Judges.
 
 ORDER
 
 1
 Following a jury trial, appellant Salvatore Cecola was convicted of conspiring to defraud the United States, from 1984 through 1995, by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue Service in the ascertainment, computation, assessment and collection of income taxes and payroll taxes in violation of 18 U.S.C. § 371. Cecola was also convicted of filing false tax returns for the tax years 1989 through 1993 in violation of 26 U.S.C. § 7206(1). At sentencing, the district court found that Cecola was "a leader and organizer" of the conspiracy, and adjusted his sentence upward by four levels pursuant to U.S.S.G. § 3B1.1(a). The district court sentenced Cecola to 46 months' imprisonment, three years' supervised release, and a fine of $10,000. On appeal, Cecola argues that the district court erred in finding that he was a leader of the conspiracy because his activities were limited to his involvement in a legitimate business and had nothing to do with the conspiracy. Because the district court plausibly interpreted Cecola's activities as revealing leadership of the conspiracy, we affirm.
 
 FACTS
 
 2
 In 1993, agents of the IRS began to investigate the finances of Odyssey Video, in Bristol, Wisconsin, and Ogden Books, in Downers Grove, Illinois. Odyssey and Ogden were adult entertainment stores that sold videos, magazines, lingerie and other similar items. The stores also featured video arcades. In December, 1993, the IRS agents searched Ogden and the home of Ogden employee Raymond Magray. During the search they seized cash registers and register tapes that had been discarded in garbage cans. Thereafter the agents interviewed various employees of Odyssey and Ogden. From the seized evidence and information provided by cooperating employees, the agents were able to conclude that the owners of Odyssey and Ogden were evading income taxes by skimming sales proceeds. Specifically, the agents reconstructed the following facts.
 
 
 3
 In 1983, Frank Panno, John Spudeas, and Salvatore Cecola purchased property in Kenosha, Wisconsin. In 1984, they established Odyssey on that property. However, they kept their ownership of Odyssey hidden, and enlisted Robert Burns as the store's "front owner." Burns signed a phony leasing agreement with LaSalle Management, a video equipment leasing company owned by Cecola. Although LaSalle never provided any of the equipment used in the store, Odyssey paid LaSalle $5,500 per month. Cecola was frequently present at the store and made inventory decisions when he was there. Profits of Odyssey were split as follows: Burns received 10%, James Gaudie (a former LaSalle employee who worked at Odyssey) received 5%, and Cecola, Panno and Spudeas split the remaining 85% equally.
 
 
 4
 In 1984, Panno and Gaudie instructed various Odyssey personnel, including Burns and Fred Stern (who was later to be a government witness at the trial) on how to skim proceeds from Odyssey profits. When instructing Burns, Gaudie explained: "this is the way we do business." During the next decade, the Odyssey personnel systematically destroyed cash register tapes and records and replaced them with false tapes and records to create the impression that the business received approximately twenty-five percent less cash than it actually did. Further, only 50% of the coins that clients inserted into the video machines were deposited in Odyssey's bank account and reported to the IRS. False records were supplied to accountants who prepared false income tax returns to be signed and filed by Burns. In addition, the store's employees received half of their pay in cash, and this income was never declared to the IRS.
 
 
 5
 In 1984, Cecola negotiated a lease for the Ogden store. Similarly to the situation at Odyssey, the real lessors were Panno, Spudeas and Cecola, but the front lessor (i.e. the individual who signed the papers) was an individual named Spero Palladino rather than Burns. Again, the conspirators implemented an elaborate skim scheme. Employees who had implemented the scheme at Odyssey were brought to Ogden to implement the scheme there. Thus, Craig Solomon worked at Odyssey until Cecola made him manager of Ogden. Later, Cecola fired Solomon and replaced him with Stern, moving Stern from Odyssey. In addition, Cecola fired Jim Moses, who had worked first as a clerk at Odyssey and then as a maintenance man at Ogden. Cecola also fired Stern when he discovered that Stern was stealing money from the skimmed proceeds. However, Cecola then payed Stern $1000 to teach him how to keep the fake records. When Stern was contacted by the IRS in 1994, Stern called Cecola and asked for help with legal fees. Cecola told Stern that someone named Don would contact him and that he should remember that Palladino owned Ogden. A short time later, a man named Don remitted $1000 to Stern, apparently to cover Stern's legal fees.
 
 
 6
 The IRS agents concluded that the conspirators skimmed more than $2,500,000 in gross receipts from the two stores, of which Cecola's total share was $610,901. On this basis, the Presentence Investigation Report recommended assigning Cecola a base offense level of 18. However, the PSI recommended that this base level be enhanced by two points for use of "sophisticated means" (viz. the creation of false cash register tapes) under U.S.S.G. § 2T1(b)(2), and by four points on account of Cecola's role as a leader and organizer of the offense under U.S.S.G. § 3B1.1. The PSI justified the four-level enhancement by referring to Cecola's "overall level of authority" and to the fact that the conspiracy "involved more than five participants." Elsewhere the report noted: "Salvatore Cecola and Frank Panno are viewed as being more culpable than the other defendants due to their ownership interests and their decision-making authority." In written objections to the PSI and at sentencing, Cecola submitted a different calculation of the skimming proceeds and maintained that only a tax loss of $178,340 should be attributed to him. Cecola argued that he and the other conspirators did not use "sophisticated means," and that he had not played a role as leader or organizer. Cecola asserted that he exercised ownership interests and decision-making authority only to the extent that he was involved in the legitimate business operations of Odyssey and Ogden. Moreover, Cecola moved for a downward departure on the basis of his wife's illness, potential job loss to innocent third parties, and on the grounds that a briefer period of incarceration would facilitate payment of restitution.
 
 
 7
 The district court adapted all of the PSI's factual findings and denied the motion for a downward departure. The district court sentenced Cecola to 46 months' imprisonment, three years' supervised release, and a fine of $10,000.
 
 
 8
 Cecola appeals only the district court's ruling that he was a leader and organizer of the conspiracy. He argues that the court failed to engage in any meaningful analysis of the leadership issue and clearly erred in failing to recognize the distinction between his conspiratorial activities and his involvement in the legitimate business operations of Odyssey and Ogden.
 
 ANALYSIS
 I. Aggravating role
 
 9
 We review for clear error a district court's determination under U.S.S.G. § 3B1.1(a) that a factual basis exists for concluding that a defendant was an organizer or leader of criminal activity. United States v. Porretta, 116 F.3d 296, 299 (7th Cir.1997). The district court's factual determinations should be upheld "unless, after reviewing the record, we are left with the firm conviction that a mistake has been made." United States v. Tanksley, 104 F.3d 924, 925 (7th Cir.1997) (per curiam).
 
 
 10
 A minimal requirement for any enhancement under § 3B1.1 is that the defendant "must have had some real and direct influence, aimed at furthering the criminal activity, upon one other identified participant." United States v. Mankiewicz, 122 F.3d 399, 405 (7th Cir.1997) (citing United States v. Mustread, 42 F.3d 1097, 1103 (7th Cir.1994)) (emphasis added). The purpose of a § 3B1.1 enhancement is "to assign relative responsibility." Id. at 406. Section 3B1.1(a) provides for a four-level enhancement to the sentence of a defendant who has been "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." United States v. Magana, 118 F.3d 1173, 1203 (7th Cir.1997). A "participant" is "any person criminally responsible for an offense, whether or not he was convicted." Mustread, 42 F.3d at 1103.
 
 
 11
 In order to qualify as a leader or organizer, the defendant must also have exercised a measure of influence over "at least four other participants in the offense." Magana, 118 F.3d at 1203 (citing United States v. Hall, 109 F.3d 1227, 1234 (7th Cir.1997)). Thus, beyond the requirement of "real and direct" influence over one participant, the defendant must have had some measure of control over at least four additional participants. However, the standard defining the relationship with the additional participants is less stringent than the "real and direct influence" of the initial requirement. Rather, the defendant's control over the other participants may be either "direct or indirect." Id. (emphasis added). A mere "isolated incident" does not make the defendant into a leader or organizer, Mustread, 42 F.3d at 1104-1105, but the word "control," in the context of § 3B1.1(a), is used "in a broad sense to mean some kind of supervisory or organizational role with respect to [the four additional] participants, including recruitment...." Magana, 118 F.3d at 1203.
 
 
 12
 Cecola concedes that there were five or more criminally responsible persons, but denies that he led or organized them. A review of the record amply supports the district court's determination that Cecola did lead and/or organize five criminally responsible persons. Cecola reassigned Stern from Odyssey to Ogden, thereby indirectly exercising control over Burns and Palladino, the front owners of the two stores. Later, Cecola fired Stern; but still later Stern turned to Cecola when the IRS contacted him and Cecola sent a messenger to him with a thousand dollars for "legal fees." Before firing Stern, Cecola ordered Ogden employee Magray to preserve and bring him the true, original records of proceeds in order to compare those records with Stern's records and determine whether Stern was stealing from the skimmed money. Cecola also hired and fired Craig Solomon. Cecola fired Jim Moses. In addition, Cecola ordered Burns to sign phony leasing agreements between Odyssey and Cecola's own company, LaSalle, so that $5,500 could be diverted to LaSalle each month. All of these actions are legitimately regarded as indicative of a "supervisory or organizational role." Viewing Cecola's involvement in the tax evasion scheme in light of all the trial evidence, the court properly determined that Cecola led or organized at least five participants in the scheme. The court's determination was based on the plausible testimony of many witnesses, and therefore contains no clear error.
 
 
 13
 Cecola also claims that his involvement (or leadership) was limited to "legitimate business" activities. This claim is belied by the fact that Cecola and his colleagues carefully concealed their ownership of the Odyssey and Ogden businesses. For example, a document used by Ogden's accountants states at the top: "Ogden Book Store notes. Do not use Sam Cecola's name on any mail to store. Just address all mail to store only. Contact for store Fred Stern." From this document the district court was entitled to infer that Cecola himself hid his ownership of Ogden by giving particular instructions to the accountants. It is thus difficult not to accept the government's argument that both Ogden and Odyssey existed for the sole and unique purpose of evading taxes through the skimming scheme.
 
 
 14
 Finally, Cecola points out that if he had been a leader, the other defendants would not have "snubbed" him by "exclud[ing]" him from participation in three other business enterprises. Contrary to the government's assertion, Cecola did present this argument to the district court; thus the argument is not waived. However, the argument is unconvincing. Of the three additional businesses, two were not doing well enough to engage in skimming, and the third never opened. The businesses that provided the tax loss figure for the Sentencing Guidelines base offense level were Odyssey and Ogden. Therefore, the district court appropriately considered Cecola's role in reference to Odyssey and Ogden alone.
 
 
 15
 II. Paucity of analysis on the part of the district court
 
 
 16
 With respect to Cecola's denial that he had played a role as leader or organizer, the court found as follows:
 
 
 17
 I have had some difficulty with the level of your involvement, but I do honestly believe--and I tell you that--that you were a leader in this case and an organizer. I know Mr. Stern had to teach you how to effect the skim, but that was simply the mechanics of it. I do think you were beyond someone who was a manager or supervisor, and there were a number of people involved--five or more--that you lead [sic]. I do think you were a leader and organizer of this activity beyond simply your ownership position, and I so find.
 
 
 18
 Cecola maintains that the district court "did not offer a basis for its ruling, refer to the grounds urged by the probation officer, or address any of the factors contained in the commentary to § 3B1.1...." Rather, in the "statement of reasons" portion of the judgment, the court marked the box indicating that it adopted the factual findings and guideline application of the presentence report. However, the PSI also did not engage in any analysis of the factors contained in the commentary to § 3B1.1. Rather, the PSI stated simply that "Salvatore Cecola and Frank Panno are viewed as being more culpable than the other defendants due to their ownership interests and their decision-making authority."
 
 
 19
 We have held that "prior to imposing an aggravating-role enhancement under U.S.S.G. § 3B1.1(a), the district judge "must identify five participants in [the] offense ... [and] determine whether [the defendant] exhibited leadership of or control over all of the five participants." United States v. Zaragoza-Baraja, 123 F.3d 472, 483 (7th Cir.1997). In general, we have admonished district courts to "state in open court the reasons for the particular sentence [and to] make a finding on each part of the presentence report that the defendant challenges," United States v. Pippen, 115 F.3d 422, 424 (7th Cir.1997). Nonetheless, we have stated that "while we require specific findings to support an enhancement under § 3B1.1, our decisions in this area also make clear that the district court's failure to make such findings need not result invariably in a remand. Rather, we will uphold the sentence so long as the enhancement is adequately supported by the record." Zaragoza-Baraja, 123 F.3d at 483.
 
 
 20
 While Fed.R.Crim.P. 32(c)(1) generally requires explicit findings, "there are no 'magic words' a court must use; so long as it actually resolves the disputed issues on the record, a sentencing court fulfills the purpose of Rule 32." United States v. McKinney, 98 F.3d 974, 980 (7th Cir.1996); see also United States v. Demski, 72 F.3d 533, 546 (7th Cir.1995) (affirming sentence where "the statements made by the sentencing judge reflect that she did consider the record in its totality and did make findings on the 'matters controverted,' as required by Rule 32, even though she largely pointed to the PSR instead of providing detailed responses to each of the defendant's objections"); United States v. Anaya, 32 F.3d 308, 312 (7th Cir.1994) (a sentencing adjustment based on a trial judge's "hunch ... unsupported by facts" constitutes error, but a trial judge may rely on his instincts "which relate to the facts of the case"). Since the district court resolved the disputed issues regarding Cecola's role, and since the record adequately supports the district court's determination that Cecola was a leader or organizer of the conspiracy, we will uphold that determination here.
 
 CONCLUSION
 
 21
 The district court did not clearly err in enhancing Cecola's sentence for his role as leader or organizer of the conspiracy.
 
 
 22
 AFFIRMED.